Filed 11/19/19; Opinion after vacating opinion filed on 10/31/19
See Dissenting Opinion

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E069369 |
| v. | (Super.Ct.No. 16CR064675) |
| LEANDRE MARTELL, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County. John M. Tomberlin, Judge. Reversed with directions.

Nancy Susan Brandt, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Elizabeth M. Kuchar, Deputy Attorneys General, for Plaintiff and Respondent.

1

LeAndre Martell and his girlfriend, Jasmine, were in the process of moving from Los Angeles to Las Vegas when things fell apart. The two had stopped over at Jasmine's mother's home in Victorville and planned to complete the move to Las Vegas on October 6, 2016. However, that morning, Martell told Jasmine he needed to get some money, left in Jasmine's 10-year-old Chevy Malibu, which he had been driving with her permission for about a month, and drove to Los Angeles. When he was late returning, Jasmine called him, and Martell told her he wouldn't move to Las Vegas with her and wouldn't return the car. The couple, unsurprisingly, broke up, and Jasmine moved to Las Vegas without Martell. A few days later she returned to Victorville and reported her car stolen. She said she never told Martell about the police report, and never contacted the police again.

Despite their problems, the break-up didn't take. Martell helped her financially to get established in Las Vegas and visited her a few times in late October and early November. Though Jasmine said she had asked Martell repeatedly to return the car, he didn't return it during those visits. He said she never asked for the car. Back in Los Angeles on November 15, 2016, police stopped Martell while he was driving the car and arrested him for driving with a suspended license. They impounded the car and discovered it was registered to Jasmine.

After the arrest, Jasmine got her car and her boyfriend back. She recovered the car from police impound, picked Martell up from court, and the two drove to Las Vegas,

2

where they finally set up house together. He continued driving her car in Las Vegas until she bought him another one. Though their relationship was rocky, they stayed together through April 2017 when Martell left her for another woman. Jasmine then lost the car when it was impounded for illegal parking and she decided it wasn't worth the cost of getting it out.

Shortly after the final breakup, a San Bernardino County jury tried Martell and found him guilty of felony unlawfully taking or driving a vehicle. Although it wasn't clear at the time, the California Supreme Court has since held a defendant cannot be convicted of a felony for unlawfully *taking* a vehicle with the intent to permanently deprive the owner of possession unless it was worth more than $950, though they can be convicted of a felony for unlawfully *driving* a vehicle even if it is worth less than that threshold amount. (*People v. Page* (2017) 3 Cal.5th 1175.) Though the trial court correctly determined the evidence wouldn't support a jury finding that Jasmine's car was worth more than $950, it erroneously concluded Martell could be convicted of felony unlawful taking such a low-value vehicle. This error infected the court's jury instructions.

On appeal, Martell argues the trial court prejudicially failed to instruct the jury it had to find the car was worth more than $950 to convict him of a felony for permanently taking the vehicle. Under the standard we must apply on review, he is correct. (*People v. Aledamat* (2019) 8 Cal.5th 1.)

There was evidence from which a reasonable jury could have found Martell took

3

the car with the intent to permanently deprive Jasmine of possession when he drove it to Los Angeles on October 6. There was also evidence from which a reasonable jury could have found Martell committed unlawful posttheft driving of the vehicle when the police stopped him on November 15. That doesn't end our inquiry, however, because the evidence supported a further jury finding—that Jasmine had acquiesced in Martell's use of the car before Martell's arrest on November 15. If they so found, they could not have convicted Martell of posttheft driving. Consequently, there is reasonable doubt whether the jury (properly) convicted Martell of felony unlawful *driving* or (improperly) convicted Martell of felony unlawful *taking*. Since there is a reasonable chance the jury convicted under the improper theory, Martell is entitled to have his conviction reduced to a misdemeanor or to be retried for a felony conviction under a proper legal theory.

# I

## FACTS

A. *Martell and Jasmine Become Romantically Involved and Jasmine Lets Martell Use Her Car*

In 2016, Jasmine and her son lived in Los Angeles with her father, who supported them. She met LeAndre Martell online and they began a romantic relationship during the summer. According to Jasmine, the relationship started in June and lasted until April 2017. Martell said they met online in June, but didn't begin seeing each other seriously until August. At the time, Martell was in another romantic relationship with a woman named Kiesha and lived in Kiesha's home.

In September, Kiesha kicked Martell out because she was angry he was spending

4

time with Jasmine.  Martell turned to Jasmine for help, and she drove to pick him up in her 2006 Chevy Malibu.  They returned to Jasmine's home, where she told him he could use the car for the night, but asked him to return it the next morning so she could take her son to school.  According to Martell, he returned the car, they dropped her son at school, and she let him use the car again until her son's school let out.  Martell said that arrangement continued until October.  He said she gave him the keys and let him use the car freely.  "During the week days I make sure she was able to handle business, and I kept the vehicle."

Jasmine's father was not happy about the arrangement.  She said her father didn't like Martell, didn't want her spending time with him, and didn't like that she was letting him borrow the car.  Eventually, her father became so upset by the situation he told her to move out by October 1.

B.    *The Couple Begins Moving to Las Vegas, but Martell Takes the Car, Returns to Los Angeles, and Jasmine Reports the Car Stolen*

Martell and Jasmine had been discussing a move to Las Vegas because it was more affordable.  When her father asked her to leave, they turned to that idea, and secured an apartment starting October 6.  Martell helped her with the deposit.  In the meanwhile, they removed Jasmine's things from her father's house and drove to her mother's house in Victorville, where Jasmine's mother helped them rent a moving truck.  Martell said he stayed with Jasmine at her mother's house for a night or two, but wasn't comfortable there, and started staying elsewhere.  He continued driving Jasmine's car

those first days of October. Martell said she knew he had the car and didn't ask him to return it.

According to Jasmine, the two were supposed to move to Las Vegas on October 6 and planned for Martell to drive her car. That morning, Martell said he needed to go get money. The testimony on this point is unclear. Martell said he took the car to get money in Los Angeles, but Jasmine said she thought he was just going to get money out of the car. In any event, Martell left in Jasmine's car and didn't return. Instead, he drove back to Los Angeles. Jasmine said she waited for Martell, then "called him when he took so long, and he told me he was going to L.A. and not bringing my car back." She said he told her it would "be in my best interest not to call" the police. The two fought about the car, broke up, and then Jasmine drove the moving truck to Las Vegas without him. Jasmine said at that point Martell did not have permission to drive her car, except to Las Vegas.

On October 10, Jasmine reported to the police that her car had been stolen. Both Jasmine and Martell said she never told him she made the report. Jasmine also said she never spoke to the police again after the initial report.

C. *The Couple Begin to Resume Their Relationship, Martell is Arrested Driving the Car in Los Angeles, and They Return in the Car to Las Vegas*

Despite these problems, Jasmine worked to keep their relationship going. They stayed in contact using text messages and Facebook and she sent him photographs of the two of them together. Martell was responsive. According to Jasmine, he sent her his EBT card information to help her buy food and get started in Las Vegas. On November

6

1, he sent her his debit card information so she could set up a direct deposit payment to the electric company in Las Vegas. And in late October and early November, he visited Jasmine in Las Vegas. Jasmine said this happened once or twice. Martell said he visited multiple times and started helping her look after her son as early as October 18. Jasmine said she asked him repeatedly to return the car during this period, but he didn't. Martell said she didn't ask.

Back in Los Angeles on November 15, the police found Martell driving Jasmine's car with a suspended license. They arrested him, impounded the vehicle, and discovered it was registered to Jasmine. Jasmine returned to Los Angeles to retrieve her car. Jasmine said the car had suffered some damage—the back of one of the seats had been torn out and the exterior had a few dents or scratches. According to Martell, Jasmine came to pick him up from court immediately after she got the vehicle. Jasmine said these events happened in early December. Martell said she returned the day after his arrest.

Regardless of the date, while Jasmine was in Los Angeles, she and Martell got back together. This time, the move happened. Jasmine and Martell drove the Malibu back to Las Vegas, and he moved into the apartment they had rented back in October. She said she gave him permission to drive the car, and he did so until February, when she paid $2,500 for a car he could use.

Their relationship, though rocky, continued and they lived together until April 1, 2017. Martell ended the relationship because he had begun seeing someone else. When Jasmine found out about the other woman, she said she was angry and hurt.

7

Later in April, the Malibu was towed for being illegally parked. Jasmine said she didn't retrieve it, because "[i]t wasn't worth the money anymore." Other than this comment, the only evidence of the car's value introduced at trial was that she made a $2,800 down payment and was making payments on the vehicle. However, the record is silent as to when she bought the car or how much she borrowed.

Sometime after the breakup, Jasmine began a romantic relationship with Kiesha, the woman Martell left the prior summer to take up with Jasmine.

D.   *Martell is Prosecuted and Convicted for Taking Jasmine's Car*

The San Bernardino District Attorney's Office charged Martell with unlawfully taking or driving a vehicle (count 1) and receiving a stolen vehicle (Pen. Code, § 496d, subd. (a)).

During an instructions conference, the trial court asked whether the instruction on unlawful taking or driving should require the jury to find that the car had "a certain value." Defense counsel argued that it should, because "it is a theft crime."

As the parties and the court noted, the issue was then under review by the California Supreme Court. The trial court ruled, "I'm not going to require a finding of value," because there wasn't yet any citable authority requiring it to do so. The trial court therefore allowed the charge to proceed to the jury and gave the then-standard jury instruction on unlawful taking or driving a vehicle, an instruction which did not require the jury to find that the vehicle was worth more than $950.

The trial court did reach the question of value, however, because it concluded a

8

showing on value was required for the receiving a stolen vehicle count. It found there was no basis for determining the value of the car. The prosecutor noted the evidence that Jasmine had paid $2,800 down, but the trial court rejected that as sufficient because "I didn't hear how long she had it. I didn't hear how many miles she put on it. I didn't hear anything about the change of condition from the time she first acquired it to the time that Mr. Martell took the car." The trial court concluded the value of the car was "pure speculation." Based on that finding, the defense moved to dismiss the receiving a stolen vehicle count because there was insufficient evidence of the car's value.[1] The People agreed, and the court dismissed that count.

In closing arguments, the prosecution asked the jury to focus on the theory that Martell had taken the vehicle on October 6. According to the prosecutor, the case "really boil[s] down to one thing. Did the defendant have consent to drive the vehicle from Victorville to Los Angeles rather than Victorville to Las Vegas? That's the sole issue. It all boils down to, now, who do you believe? Do you believe Ms. Jasmine [], or do you believe the defendant? That's it. Who do you believe?"

The trial court instructed the jury, "To prove a defendant is guilty of [unlawfully taking or driving a vehicle], the People must prove that: [¶] 1. The defendant took or drove someone else's vehicle without the owner's consent; [¶] 2. When the defendant

---

[1] Proposition 47 applies to the crime of receiving stolen property. (Pen. Code, § 496, subd. (a).) There is disagreement whether it applies to receiving a stolen vehicle. (Pen. Code, § 496d.) (Compare *People v. Varner* (2016) 3 Cal.App.5th 360, 366 with *People v. Williams* (2018) 23 Cal.App.5th 641, 645-651.)

9

did so, he intended to deprive the owner of possession or ownership of the vehicle for any period of time. [¶] Even if you conclude that the owner had allowed the defendant or someone else to take or drive the vehicle before, you may not conclude that the owner consented to the driving or taking on and between October 6th, 2016, and November 15, 2016, based on that previous consent alone. [¶] The taking requires that the vehicle be moved for any distance no matter how small. [¶] The defendant is charged with unlawful taking or driving of a vehicle sometime during the period of October 6th, 2016, and November 15th, 2016."

The court also gave the jury a unanimity instruction. "The People have presented evidence of more than one act to prove that the defendant committed this offense. [¶] You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts, and you all agree on which act he committed."

The jury found Martell guilty of felony unlawful taking or driving a vehicle. The trial court imposed a three year term in state prison, doubled because Martell had a strike prior. Martell filed a timely notice of appeal challenging his conviction.

**II**

**ANALYSIS**

A. *Legal Background*

Vehicle Code section 10851, subdivision (a) (section 10851), makes it a crime to take or drive a vehicle, without the owner's consent, with the intent to deprive the owner

10

of title or possession, either permanently or temporarily. The offense is a wobbler; it may be punished as either a felony or a misdemeanor. (*Ibid*.)

As the Supreme Court has observed, section 10851 ""'proscribes a wide range of conduct.' [Citation.] A person can violate section 10851 by '[u]nlawfully taking a vehicle with the intent to permanently deprive the owner of possession.' [Citation.] Section 10851 can also be violated 'when the driving occurs or continues after the theft is complete' (referred to by the Supreme Court as 'posttheft driving') or by "'driving [a vehicle] with the intent only to temporarily deprive its owner of possession (i.e. joyriding).'"""" (*People v. Gutierrez* (2018) 20 Cal.App.5th 847, 853-854 (*Gutierrez*).) "Taking a vehicle with the intent to permanently deprive the owner of possession is a form of theft, and a defendant convicted of violating section 10851 with such an intent has suffered a theft conviction. [Citations.] On the other hand, posttheft driving and joyriding are not forms of theft; and a conviction on one of these bases is not a theft conviction." (*Id.* at p. 854.)

The distinction between theft and nontheft violations of section 10851 took on additional importance with the passage of Proposition 47 in 2014. Proposition 47 reduced certain theft (and drug) felonies to misdemeanors. After the initiative became effective, prosecutors could charge theft offenses as felonies only if the value of the property exceeded $950. At first, the lower courts disagreed whether Proposition 47 applied to section 10851 at all. (*People v. Van Orden* (2017) 9 Cal.App.5th 1277, 1289 & fn. 3 [collecting cases].) But the Supreme Court's decision in *People v. Page*, *supra*, 3

11

Cal.5th 1175 (*Page*)—issued after the trial in this case—resolved the question once and for all. It held Proposition 47 *does* affect section 10851 offenses involving the *taking* of vehicles worth $950 or less with intent to permanently deprive the owner of possession (permanent taking offenses). (*Page*, at p. 1187.) Such permanent taking offenses are now misdemeanors. (*Ibid.*) As a result, if the People wish to prosecute a permanent taking offense as a felony, they have to prove the vehicle taken was worth more than $950. (*Gutierrez*, *supra*, 20 Cal.App.5th at pp. 855-856.)

The same requirement doesn't apply to prosecuting posttheft driving or joyriding offenses. (*Page*, *supra*, 3 Cal.5th at p. 1188.) However, to establish a posttheft driving offense, the prosecution does need to show a "substantial break" between the taking and the driving of the vehicle. (*Ibid.*; *People v. Lara* (2019) 6 Cal.5th 1128, 1138 (*Lara*).)

B. *Failure to Instruct the Jury to Find Value*

Martell contends the trial court erred by failing to instruct the jury they had to find that the car was worth more than $950 to find him guilty for permanently taking Jasmine's car, rather than driving it afterwards.

The trial court gave the then-standard section 10851 jury instruction, CALCRIM 1820. The court told the jury to prove Martell was guilty of unlawfully taking or driving a vehicle, "the People must prove that . . . [t]he defendant took or drove someone else's vehicle without the owner's consent [and] . . . [w]hen the defendant did so, he intended to deprive the owner of possession or ownership of the vehicle for any period of time." Since Martell cannot be convicted of violating section 10851 on a taking theory without

12

evidence of the car's value, but can be convicted on a posttheft driving theory without such evidence, the trial court instructed the jury under valid and invalid theories of guilt.

When that happens, the Supreme Court recently confirmed, we "must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, [we] determine[] the error was harmless beyond a reasonable doubt." (*People v. Aledamat*, *supra*, 8 Cal.5th 1, 13.) Our inquiry in this case, then, is to determine whether it is beyond reasonable doubt the jury unanimously found Martell guilty on the valid legal theory of unlawful posttheft driving or joyriding. If so, then we may find the instructional error harmless. If, however, there is reasonable doubt about the jury's conclusion, we are *required* to reverse the conviction. Reversal is required under this standard.

C. *The Instruction Was Not Harmless*

This is a clear case where the erroneous instruction harmed the accused. The primary factor that leads to this conclusion is the state of the trial evidence. In short, substantial evidence supports a finding that Martell took the car *and* substantial evidence supports a finding that he engaged in posttheft driving. At the same time, substantial evidence also supports a finding that he neither took the car *nor* engaged in posttheft driving.

The case for a permanent taking is abundantly clear. Jasmine testified she gave Martell general permission to drive her car through October 6, but revoked the permission when he took the car to Los Angeles instead of driving it to Las Vegas. She

13

said he told her he wasn't going to return the car, and advised her not to call the police. She nevertheless reported the car stolen on October 10. The jury could reasonably have credited Jasmine's testimony and convicted Martell of taking the car with the intent to deprive her of possession permanently. (*Santa Clarita Water Co. v. Lyons* (1984) 161 Cal.App.3d 450, 458 ["'substantial evidence' is that which produces confidence, is of solid value, and may be presented in various ways to the trial court, by lay or expert testimony, by one witness or twenty witnesses"].) By the same token, the jury could reasonably have credited Martell's testimony that Jasmine never told him she had revoked her general permission. (*Ibid.*)

The case for a posttheft driving offense is less direct, but the evidence again supports either finding. There was little evidence of Martell driving the car after he took it and returned to Los Angeles, but all parties agree he was arrested driving the vehicle on November 15. Five weeks constitutes a substantial break from the taking. In other words, on November 15 Martell was not driving the car to accomplish the taking. (*Lara*, *supra*, 6 Cal.5th at p. 1138.) As a result, the question we face is the state of the evidence concerning whether Martell had permission to drive the vehicle on that day. It is true the jury could reasonably have inferred Martell lacked consent on November 15 from the evidence he didn't have consent on October 6. The problem is, however permissible that inference, it isn't *required*. It isn't even the most *likely* inference from the trial evidence, much less the *only reasonable* inference.

14

This is so because Jasmine began trying to salvage her relationship with Martell just days after reporting the car stolen, and she appeared to be succeeding. She admitted they communicated online and by text message shortly after she made the report. Among these messages was a photograph of the two of them from when they first began seeing each other. It appears, Martell responded to her efforts. He sent her his EBT card information to help her buy food, and on November 1 he helped her set up a direct deposit payment to the electric company in Las Vegas. Martell also visited Jasmine in Las Vegas during this period, she said once or twice, but he said multiple times. He said he even began helping Jasmine look after her son starting on October 18. Martell said she never asked him to return the car. And according to Jasmine, Martell called her on November 6 and told her the car had been impounded, apparently while he was on his way to Las Vegas, and he was unable to get it out. Jasmine's reaction was to tell Martell not to worry about the car, that they'd figure it out, and to ask him to have his friends bring him over to her place for dinner.[2]

What happened next is telling. When Jasmine found out about Martell's arrest, she returned to Los Angeles, picked up the car and Martell. The two drove to Las Vegas where they finally began living together. It's also notable that Jasmine immediately turned her car over to Martell again and he continued driving it until February, when she bought him another car.

---

[2] The trial court admitted this evidence over a hearsay objection only to establish Jasmine's understanding and reactions, not for the truth of the matter asserted.

A reasonable jury could have found from all this evidence that Martell had permission to use the car when he was arrested driving the vehicle—or indeed at any point after the police report. If the jury made that finding, then they couldn't have found Martell was driving the car without permission on November 15, whether there was a substantial break or not. In view of all this evidence, it's impossible to come to any conclusion but that the jury *could reasonably have found* Martell had permission to drive the car even shortly after taking it, and certainly by November 15. As a result, there is strong reason to doubt whether the jury based its verdict on a valid legal theory.[3]

If the People were to retry Martell under a valid legal theory, it may be the jury would reject Martell's entire story and find he engaged in posttheft driving without consent for the entire period of October 6 to November 15. But it's a jury's job to make that determination, not ours.

Add to the conflicting evidence the prosecutor's focus during his closing argument on the taking theory, and it's more likely than not that the jury found Martell guilty of a taking offense. The prosecutor told the jury they should focus on the taking theory. As he put it, the question for the jury was whether the "*defendant ha[d] consent to drive the*

---

[3] The People try to salvage the conviction by arguing it's beyond a reasonable doubt the jury would have found Martell took the car with the intent to only temporarily deprive Jasmine of possession. That's simply not supported by the record. The prosecution understandably spent no time trying to establish whether Martell intended to take the car permanently or temporarily; the distinction didn't appear to matter at the time of trial. The jury reasonably could have made either finding from the evidence the prosecutor did adduce. (*Gutierrez, supra*, 20 Cal.App.5th at p. 857.)

16

*vehicle from Victorville to Los Angeles* rather than Victorville to Las Vegas?  That's the *sole issue*."  (Italics added.)  While this argument doesn't establish what the jury concluded, it strongly suggests the jury focused on the taking theory of guilt.  Certainly, that's what the prosecutor asked them to do.

Numerous other courts have followed the same approach.  In *Gutierrez*, the Second District, Division Seven reversed a section 10851 conviction where the defendant, like the defendant here, "routinely drove [his girlfriend's] car, often taking her to work in the morning, keeping the car during the day, and picking her up in the evening." (*Gutierrez* , *supra*, 20 Cal.App.5th at p. 850.)  Things changed after the girlfriend had an accident and began driving a rental car.  One evening, Gutierrez told his girlfriend he was leaving their home and drove off in the rental car.  The girlfriend said she didn't realize he'd taken the car and called him around 30 minutes later when she discovered he'd done so.  She said she told him to bring the car back.  An hour later, he returned, but then got back in the car when he saw her and drove off.  Around three hours later, police saw him run a stop sign and drive above the speed limit.  After a chase, Gutierrez failed two sobriety tests and the police arrested him.  Though these facts strongly suggest joyriding rather than theft, and there was evidence of a substantial break between the taking and the driving incidents, the court concluded "[o]n this record we simply cannot say whether Gutierrez was convicted under a legally valid nontheft theory or a legally invalid theory of vehicle theft that did not include as an element the value of the stolen car." (*Gutierrez,* at

17

p. 857.)

In *People v. Bussey* (2018) 24 Cal.App.5th 1056 (*Bussey*), review granted September 12, 2018, S250152, the court agreed with *Gutierrez* that where "'jury instructions that failed to [distinguish adequately] among, and separately define the elements for, each of the ways in which section 10851 can be violated[,]'" absent any express evidence on which theory the jury based its verdict, reversal and remand for retrial was appropriate. *(Bussey,* at pp. 1061-1062, quoting *Gutierrez, supra,* 20 Cal.App.5th at p. 856.)

Likewise, in *People v. Jackson* (2018) 26 Cal.App.5th 371 (*Jackson*), the First District, Division One concluded reversal of a section 10851 conviction was required even in the face of "strong circumstantial evidence that [the defendant] drove the [vehicle]." (*Jackson*, at p. 375.)  The court pointed out "prejudice is *presumed* with this type of error" because ""Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law. . . .  When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error."" (*Id.* at p. 378.)  The court concluded reversal was required because substantial evidence supported the taking theory too.  "While the evidence of driving may have been stronger than the evidence of taking, substantial evidence was introduced to support a conviction for stealing the Land Cruiser, based on Jackson's possession of it under suspicious circumstances shortly after it was stolen." (*Id.* at

18

p. 380.)

We follow our sister courts and conclude Martell was prejudiced by the trial court's understandably erroneous instruction. We also agree with those courts that the appropriate remedy is to allow a retrial on the felony charge if the People can in good faith bring such a case. (*Gutierrez*, *supra*, 20 Cal.App.5th at p. 858; *Bussey*, *supra*, 24 Cal.App.5th at p. 1064; *Jackson*, *supra*, 26 Cal.App.5th at p. 381.)

## III

## DISPOSITION

We vacate the sentence and remand for the People to decide whether to accept a reduction of the conviction to a misdemeanor or to retry Martell for a felony violation of section 10851. If the People elect to accept the reduction of the conviction to a misdemeanor, the court should then resentence Martell in accordance with that election.

CERTIFIED FOR PUBLICATION

SLOUGH_____
                                                                                          J.

I concur:

FIELDS_____
                              J.

19

[*People v. Martell*, E069369]

Ramirez, P. J., Dissenting.

The majority holds that there was substantial evidence that defendant LeAndre Martell did not have permission to drive his girlfriend's car on October 6, 2016 but did have it on November 15, 2016. Because I disagree, I respectfully dissent.

Defendant testified that he had his girlfriend's permission on both dates. His girlfriend, as a woman scorned, had a reason to lie. The People, the majority, and I all agree that the trial court was required to instruct on both an unlawful driving and an unlawful taking theory and, in connection with the former, to instruct the jury to determine the value of the car. In my view, however, its failure to do so was harmless.

Defendant testified that he had permission at all times. The jury evidently disbelieved this testimony. His testimony afforded no basis for finding that he did not have permission on October 6, but he did on November 15.

Defendant's girlfriend testified that, between October 6 and November 15, she and defendant kept in contact via text messages and Facebook. She sent him pictures of the two of them together. He let her open an electricity account using his debit card number, so she would not have to make a $200 deposit. She also testified that he visited her in Las Vegas once or twice; on one of these visits, "he helped [her] with food" by lending her his EBT card. During these visits, however, she never saw her car, and he did not offer to return it. She admitted wanting "to try to patch things up." However, she also

1

testified that, during this period, she asked him "[c]ountless times" to return her car. She specifically testified that, when defendant was arrested, he did not have permission to drive her car.

In December, on the day defendant got out of jail, his girlfriend went to Los Angeles, got her car out of impound, and picked him up. At that point, he apologized for taking the car. They went back to Las Vegas and moved in together. Only after that, she testified, did she give him permission to drive her car again.

To conclude that, sometime between October 6 and November 15, defendant's girlfriend gave him permission to drive her car — based solely on the evidence that she was trying to resuscitate her relationship with him — would be speculation. Had that actually happened, defendant could have so testified, but he did not; he staunchly maintained that he always had permission.

I also disagree that the prosecutor focused on the unlawful taking on October 6. In his closing, he stated that the elements of the crime included either taking or driving. He pointed out that "[defendant] used [the car] from the day he took it all the way until he got arrested in Los Angeles." He told the jurors, "The only issue is whether or not [Jasmine] consented to the defendant driving her car from . . . October 6th . . . until he was found with the car in L.A. on November 15th." Thus, he did not tell the jury to rely solely on the taking.

In sum, defendant had permission for both the October taking and the November 15 driving, or for neither; the evidence gave the jury no room to draw a line between

2

them in terms of permission.  I am therefore convinced — beyond a reasonable doubt — that even if the jury had been instructed that it could not find defendant guilty on an unlawful taking theory unless it found that the car was worth more than $950, it would still have found him guilty on an unlawful driving theory.

RAMIREZ
P. J.

3