Filed 11/5/20  P. v. Balcha CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>TALEW CHEWAKA BALCHA,<br><br>    Defendant and Appellant. | D076330<br><br><br><br>(Super. Ct. No. SCS304761) |

APPEAL from a judgment of the Superior Court of San Diego County, Garry G. Haehnle, Judge.  Affirmed.

Heather L. Beugen, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Daniel Rogers and Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Talew Balcha was charged with assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)),[1] with great bodily injury enhancement allegations (§§ 12022.7, subd. (a), 1192.7, subd. (c)(8)), after he struck an acquaintance with a bladed object, allegedly in self-defense. The jury found Balcha guilty and found the enhancement allegations to be true. The trial court sentenced him to six years in prison.

On appeal, Balcha contends the trial court erred by including *inherently* deadly weapons in CALCRIM No. 875's definition of "deadly weapon" because he maintains the bladed object he used was not inherently deadly as a matter of law. On the record before us—where Balcha admitted he "swung" the bladed object at the victim, "stab[bed]" him with it, and stipulated that he inflicted numerous injuries—we conclude any alleged instructional error was harmless beyond a reasonable doubt. Accordingly, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. **The Offense**

Balcha and the victim, M.S., moved from Ethiopia to the United States, where they met while working together at a convenience store in 2011. They considered each other coworkers and acquaintances, but not friends. At some point, they both began driving taxicabs.

In early October 2018, Balcha accused M.S. of stealing a customer from him at a downtown hotel. According to M.S., Balcha became "aggressive" and "started cursing [him] out," so M.S. left. According to Balcha, M.S. insulted him using an Ethiopian tribal slur. M.S. denied doing so.

---

[1]    Further undesignated statutory references are to the Penal Code.

On October 28, the day of the assault, Balcha and M.S. encountered each other several times. According to M.S., that morning he was first in line at a taxi stand downtown when Balcha blocked him in and said, "I am going to find you and kill you." According to Balcha, he was in line at the taxi stand when he saw M.S. pull up behind him, so Balcha left the area to avoid any trouble.

About one hour later, they encountered each other again at an intersection near the harbor. According to Balcha, M.S. repeated the tribal insult and added, "I am going to kill you." When the traffic light turned green, M.S. drove off.

The assault occurred when Balcha and M.S. encountered each other again at about 1:00 p.m. while dropping off passengers at a campground in Chula Vista. Balcha dropped his passengers first, and drove out of the campground. According to M.S., Balcha threatened him as he left. According to Balcha, M.S. repeated the tribal insult, threatened to kill him, and suggested that Balcha wait for him down the road. Balcha decided he would wait down the road so he could find out why M.S. was insulting him. A third taxicab driver at the campground testified he saw Balcha looking angrily at M.S., who did not look angry or say anything to Balcha.

Balcha left the campground and stopped on the side of the road. The third taxicab driver left next, and stopped in the traffic lane next to Balcha to ask if everything was okay. Balcha responded that M.S. had insulted him. The driver told Balcha to "take it easy," but Balcha's "anger [was] getting worse."

M.S. exited the campground and stopped behind the cabs blocking the road. Balcha got out of his cab, approached the passenger side of M.S.'s cab, started arguing, and kicked the door of M.S.'s cab. M.S. tried to leave but

3

was pinned in by traffic. Balcha claimed M.S. insulted and threatened to kill him during this argument. M.S. asked, "What's wrong [with you]," got out of his cab, and went around to inspect the damage. He observed a large dent, which he later paid $300 to repair. M.S. was so upset that he went to the passenger side of Balcha's cab and kicked the door, causing little to no damage.

According to M.S., Balcha came charging at him from around the cab and started a physical altercation. According to Balcha, he approached M.S. to get him to stop kicking the cab, and M.S. grabbed Balcha's throat and tried to choke him. The men fell to the ground, got back up, and fought. The third cab driver stayed out of the way and called 911.

Balcha and M.S. both testified that during the ensuing altercation, Balcha pulled out some sort of bladed object and repeatedly struck M.S. with it—at least seven times, according to M.S. Balcha delivered the final blow when M.S. was on the ground, which Balcha admitted may have been "excessive."

Police and paramedics responded to the scene. A police officer testified he saw blood "spurt" from a "large laceration" or "deep cut" on M.S.'s head. A paramedic testified he saw numerous lacerations and a puncture wound on M.S. consistent with knife wounds. Because the puncture wound could be fatal if too deep, medical personnel asked Balcha how long his "knife" was. Balcha did not correct their use of the word "knife," and indicated with his hands that it was between three and four inches long. The paramedic bandaged M.S. and transported him to the hospital. The police officer accompanied M.S. because the officer "knew that his injuries seemed to be severe."

4

The parties stipulated that M.S. was treated at the hospital for the following injuries: (1) a 10-centimeter laceration from above the right eye extending to the right ear; (2) a three-centimeter laceration to the jaw; (3) approximately five superficial, small lacerations to the head; (4) swelling to the right periorbital region; (5) a two-centimeter laceration to the posterior neck; (6) a three-centimeter laceration to the left arm; (7) a stab wound on the right side of the neck; (8) a hematoma on the right side of the scalp; and (9) a chip fracture of the right temporal bone.

Balcha sustained a laceration on the little finger of his right hand.

Balcha's bladed object was never recovered, and he admitted at trial that he may have told police he threw it into a river. He described the object as "[a]n apple cutter" with a two and one-half inch handle and a two and one-half inch folding blade. He said he only used it to cut fruit, and had never "used this blade as a weapon before." He admitted he "swung this blade—this apple cutter at [M.S.]," and used it to "stab" M.S. when he was on the ground. M.S. and the other cab driver testified they did not see the object.

A security camera at a condominium complex about 275 feet away captured the assault, and the footage was played at trial.

## B. **Charges, Verdicts, and Sentencing**

Balcha was charged with assault with a deadly weapon (§ 245, subd. (a)(1)), with great bodily injury enhancement allegations (§§ 12022.7, subd. (a), 1192.7, subd. (c)(8)); and vandalism (§ 594), for kicking M.S.'s cab door.

At trial, Balcha claimed self-defense on the assault count, and conceded the vandalism count. After deliberating for about one hour, the jury found Balcha guilty on both counts and found the great bodily injury enhancement allegations to be true.

The trial court sentenced Balcha to six years in prison.

5

## II. DISCUSSION

Balcha contends the trial court erred by including "inherently deadly" weapons in CALCRIM No. 875's definition of "deadly weapon" because he maintains the bladed object he used was not inherently deadly as a matter of law. The Attorney General maintains the instruction was proper because the jury could have found that the bladed object was an inherently dangerous dirk or dagger. Alternatively, the Attorney General contends any instructional error was harmless. We agree that any error was harmless beyond a reasonable doubt, and therefore need not determine whether the bladed object was inherently deadly.

### A. **Background**

The trial court instructed the jury on the elements of assault with a deadly weapon using CALCRIM No. 875, which states in pertinent part:

> "To prove that the defendant is guilty of [assault with a deadly weapon other than a firearm], the People must prove that:
>
> "1. The defendant did an act with a deadly weapon other than a firearm that by its nature would directly and probably result in the application of force to a person;
>
> "2. The defendant did that act willfully;
>
> "3. When the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to a person;
>
> "4. When the defendant acted, he had the present ability to apply force with a deadly weapon other than a firearm to a person; [¶] AND
>
> "5. The defendant did not act in self-defense. [¶] . . . [¶]
>
> "A *deadly weapon other than a firearm* is any object, instrument, or weapon **[a]** that is inherently deadly or **[b]**

6

one that is used in such a way that it is capable of causing and likely to cause death or great bodily injury."

The court did not define "inherently deadly."

The prosecutor argued in closing that she did not "think Elements 1 through 4 are in dispute," so she was only "going to talk . . . about" "Element No. 5, whether or not the defendant acted in self-defense."

In portraying Balcha as the aggressor, the prosecutor emphasized he had "hit the victim more than seven times with the knife," and that M.S.'s "deep lacerations and deep puncture wounds . . . require[d] a certain amount of force." Similarly, she argued Balcha sustained the "laceration to his hand because that is what happens when you're holding a knife with a long blade and you are using so much force to stab repeatedly at someone that [the] knife will slip up and cut your hand."

After explaining why she believed Balcha had not acted in self-defense, the prosecutor explained to the jury that the only difference between the charged offense of assault with a deadly weapon and the lesser included offense of simple assault is that the latter is established "if you find that there was no deadly weapon that was used." She then discussed CALCRIM No. 875's definition of deadly weapon:

> "Now, a deadly weapon is an object, instrument, or weapon that is inherently deadly or one that is used in a way that is capable of causing death or great bodily injury. So a knife or if you want to call it an apple cutter, a sharp, pointy object with a blade is a deadly weapon, and we have had overwhelming evidence that a deadly weapon was used from the witnesses and from the defendant himself. So this is not an issue."

The prosecutor concluded by explaining that if the jury found Balcha's self-defense claim viable, then the jury should find him not guilty of both assault with a deadly weapon and simple assault.

7

As predicted, defense counsel devoted her entire closing argument to self-defense. She argued Balcha used his bladed object only as a last resort:

> "It wasn't until he was choked that he decided to get physical. And it was in fear for his life that he grabbed that blade. And it was in fear for his life that he swiped and punched and did what he could until the threat was over. [¶] This is a man who has never been in a fight before. This is a man who has gone almost 49 years without ever using this apple cutter as a blade, without ever using it as a weapon, without ever using it on somebody, because it was never that tool for him. It was never going to be a weapon. [¶] *And he never used it as a weapon until he was forced to.*" (Italics added.)

In rebuttal, the prosecutor focused on Balcha's attempt to "minimize[] the weapon":

> "He is calling it an apple peeler or an apple cutter. He is saying the blade is only two and a half inches. I mean, do you know what kind of force it would take to take a small, light, skinny apple cutter—or, you know, tiny little folding blade of two and a half inches to cause the injuries that were caused? [¶] I mean that would really take some serious effort at close range to be penetrating the skin in those ways that you see in those pictures. And if you are using that force and that effort, you are not just putting your hands up and trying to back off a person and get them away. You are trying to inflict pain, hurt them, or kill them."

### B. **Legal Principles**

" 'As used in section 245, subdivision (a)(1), a "deadly weapon" is "any object, instrument, or weapon which is used in such a manner as to be capable of producing and likely to produce, death or great bodily injury." [Citation.] Some few objects, such as dirks and blackjacks, have been held to be deadly weapons as a matter of law; the ordinary use for which they are designed establishes their character as such. [Citation.] Other objects, while

8

not deadly per se, may be used, under certain circumstances, in a manner likely to produce death or great bodily injury. In determining whether an object not inherently deadly or dangerous is used as such, the trier of fact may consider the nature of the object, the manner in which it is used, and all other facts relevant to the issue.' " (*People v. Aledamat* (2019) 8 Cal.5th 1, 6 (*Aledamat*).)

When a defendant commits an assault with an object that is not inherently deadly as a matter of law, a trial court errs by instructing the jury with a definition of "deadly weapon" that includes both the invalid inherently deadly theory and the valid as-used theory. (*Aledamat*, *supra*, 8 Cal.5th at p. 7.) This "alternative-error theory is subject to the more general *Chapman* [*v. California* (1967) 386 U.S. 18] harmless error test," under which the "reviewing court must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, it determines the error was harmless beyond a reasonable doubt." (*Aledamat*, at p. 13.)

The California Supreme Court recently applied these principles in *Aledamat*, in which the defendant thrust a box cutter at the victim while threatening to kill him. (*Aledamat*, *supra*, 8 Cal.5th at p. 4.) The high court concluded that because a box cutter is a type of knife, and because most knives are not inherently deadly, the trial court erred by instructing the jury with CALCRIM No. 875's definition of "deadly weapon" because it included both the invalid inherently deadly and valid as-used theories. (*Aledamat*, at pp. 6-7.) But the court found "[a] number of circumstances [demonstrated] beyond a reasonable doubt that the error was harmless." (*Id.* at p. 13.)

First, the *Aledamat* court observed that although the alternative definitions "[t]echnically" created a potential for prejudice (*Aledamat*, *supra*,

9

8 Cal.5th at p. 13), the risk was mitigated by the fact that CALCRIM No. 875 "juxtapos[ed]" the inherently deadly definition with the as-used definition, thereby "at least indicat[ing] what the 'inherently deadly' language was driving at" (*Aledamat*, at p. 14). The court noted the jury was also instructed with CALCRIM No. 3145 to "consider all of the surrounding circumstances" when "deciding whether an object is a deadly weapon." (*Aledamat*, at p. 14.)[2]

Second, the *Aledamat* court reasoned that counsels' closing arguments supported the conclusion that the jury was unlikely to have found the box cutter was deadly without considering how the defendant had used it. (*Aledamat*, *supra*, 8 Cal.5th at p. 14.) In this regard, the *Aledamat* court observed that neither the prosecutor nor defense counsel "suggested to the jury that there were two separate ways it could decide whether the box cutter was a deadly weapon" (*ibid.*), and defense counsel "never argued that, if [the defendant] did assault the victim with the box cutter, the box cutter was not a deadly weapon" (*ibid.*). Indeed, on the record before it, the *Aledamat* court found such an argument would have been "futile." (*Ibid.*)

Finally, the *Aledamat* court posited that the jury "must have considered the term 'inherently deadly' to mean *something*." (*Aledamat*, *supra*, 8 Cal.5th at p. 15.) In light of what the jury necessarily found in deeming the other elements of the assault offense satisfied, the *Aledamat* court found that " '[n]o reasonable jury that had made all of these findings would have failed to find' that [the] defendant used the box cutter in a way

_____

2    CALCRIM No. 3145 states in part: "In deciding whether an object is a deadly weapon, consider all the surrounding circumstances, including when and where the object was possessed[,] [and] [where the person who possessed the object was going][,] [and] [whether the object was changed from its standard form] [and any other evidence that indicates whether the object would be used for a dangerous, rather than a harmless, purpose.]"

10

that is capable of causing or likely to cause death or great bodily injury." (*Ibid.*)

## C. **Analysis**

We conclude on the record before us that any instructional error regarding the definition of a "deadly weapon" was harmless beyond a reasonable doubt.

There was extensive trial testimony about the manner in which Balcha used the bladed object. M.S. testified Balcha struck him with it at least seven times. Balcha admitted he "swung" the object at M.S., used it to "stab" him, and had never "used this blade as a weapon *before*" (italics added), thus impliedly admitting he had used it as a weapon *on this occasion.* The jury saw security footage that, by virtue of being captured from 275 feet away, likely emphasized Balcha's actions rather than the bladed object's characteristics. And there was extensive testimony and a stipulation about the nature of M.S.'s injuries, which the paramedic considered potentially fatal and the police officer deemed "severe."

By contrast, there was very little evidence about the nature of the bladed object itself. It was never recovered or produced at trial. Neither M.S. nor the third cab driver saw it. And Balcha downplayed it, characterizing it as an apple cutter. It is exceedingly unlikely the jury found that the bladed object was a deadly weapon without considering the manner in which Balcha used it.

Based on this evidence, it is not surprising that neither the prosecutor nor defense counsel "suggested to the jury that there were two separate ways it could decide whether the [bladed object] was a deadly weapon." (*Aledamat*, *supra* 8 Cal.5th at p. 14.) To the contrary, both counsel focused on the manner in which Balcha used the bladed object. In her initial closing, the

11

prosecutor observed that both M.S.'s and Balcha's wounds resulted from the application of extreme "force." Similarly, in her rebuttal, the prosecutor again emphasized the "kind of force it would take" for Balcha to have inflicted M.S.'s injuries. After reciting CALCRIM No. 875's definition of "deadly weapon," the prosecutor argued that element "is not an issue" because of the "overwhelming evidence . . . from the witnesses and from the defendant himself" about how "a deadly weapon was used." This included Balcha's admission that he "swung" the object at M.S. and "stab[bed]" him with it.

We recognize the prosecutor included "inherently deadly" when reading the definition, and asserted that "a sharp, pointy object with a blade is a deadly weapon." But we find these passing comments are vastly outweighed by the prosecutor's focus on Balcha's use of the object, which she emphasized to undermine his self-defense claim. In this vein, the prosecutor conceded that if the jury found Balcha not guilty of assault with a deadly weapon based on self-defense, then the jury should also find him not guilty of simple assault. This conveyed to the jury that the pivotal question was the viability of Balcha's self-defense claim, not whether the bladed object was a deadly weapon.

For her part, defense counsel never argued Balcha was not guilty because the bladed object was not a deadly weapon. (See *Aledamat*, *supra*, 8 Cal.5th at p. 14 ["counsel never argued that, if he did assault the victim with the box cutter, the box cutter was not a deadly weapon"].) Rather, she focused almost exclusively on his self-defense claim. Indeed, in doing so, defense counsel implicitly conceded that Balcha had used the bladed object as a deadly weapon—"he never used it as a weapon until he was forced to." (See *ibid*. ["Although defense counsel did not expressly concede that the box cutter

12

was a deadly weapon, he did not contest the point."].) Here, as in *Aledamat*, "[c]ontesting the point would have been futile." (*Ibid.*)

The jury's necessary findings on other issues further support that the jury based its deadly weapon finding on the manner in which Balcha used the bladed object and not on its inherent characteristics. As in *Aledamat*, Balcha's jury necessarily found the other elements of assault were satisfied, including that Balcha "did an act with a deadly weapon (either inherently or as used) that by its nature would directly and probably result in the application of force" to M.S. (*Aledamat, supra*, 8 Cal.5th at p. 15.) The jury also expressly found that Balcha "personally inflicted great bodily injury" on M.S., strongly suggesting the jury was focused on how Balcha used the bladed object, rather than on its inherent characteristics. We are satisfied that " '[n]o reasonable jury that made all of these findings could have failed to find' that [Balcha] used the [bladed object] in a way that is capable of causing or likely to cause death or great bodily injury." (*Ibid.*)

None of Balcha's arguments persuade us otherwise. He notes that the jury in *Aledamat* was also instructed with CALCRIM No. 3145 to "consider all the surrounding circumstances," whereas his jury was not. (See *Aledamat, supra* 8 Cal.5th at p. 5.) But this instruction was just one of many grounds on which the *Aledamat* court found the error harmless beyond a reasonable doubt. We, too, have based our harmless error finding on many grounds.

Balcha also argues his case is distinguishable from *People v. Stutelberg* (2018) 29 Cal.App.5th 314, in which our court found similar instructional error to be harmless. We are not persuaded. First, although Balcha correctly observes that in *Stutelberg* the "parties agree[d] . . . the prosecutor did not expressly refer to the 'inherently deadly weapon' theory" (*id.* at p. 322), we

13

have already explained why the prosecutor's comments here did not amount to an invocation of the inherently deadly theory, particularly in light of her overall emphasis on Balcha's actual use of the object. (See *ibid.* ["the prosecutor went on to discuss [the defendant]'s use of the razor blade to 'swipe' at the victims and to 'slash open' [one victim]'s face."].)

Second, Balcha argues his self-defense claim was "stronger" than the *Stutelberg* defendant's claim. But he fails to explain how the strength of a defendant's self-defense claim has any bearing on whether the object he used in self-defense was inherently deadly or deadly as used. Indeed, the prosecutor illustrated the independence of these issues by conceding that a viable self-defense claim would preclude liability for both assault with a deadly weapon *and* simple assault.

In sum, because Balcha essentially conceded at trial that he had used a bladed object as a deadly weapon (but allegedly did so only in self-defense), any error in including "inherently deadly" in the definition of "deadly weapon" was harmless beyond a reasonable doubt.

## III.  DISPOSITION

The judgment is affirmed.

HALLER, Acting P. J.

WE CONCUR:


AARON, J.


DATO, J.

14