Filed 6/28/21  P. v. Jackson CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MICHAEL ANTHONY JACKSON,<br><br>    Defendant and Appellant. | B302437<br><br>(Los Angeles County<br>Super. Ct. No. VA146489) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Olivia Rosales, Judge.  Affirmed.

Heather L. Beugen, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Scott A. Taryle and Idan Ivri, Deputy Attorneys General, for Plaintiff and Respondent.

————————————————

## INTRODUCTION

A jury convicted Michael Anthony Jackson of assaulting Shantee Cleaves-Hall with a holiday lawn ornament and other crimes. Jackson argues the trial court committed prejudicial alternative-theory error under *People v. Aledamat* (2019) 8 Cal.5th 1 (*Aledamat*) by instructing the jury on the elements of assault with a deadly weapon with a version of CALCRIM No. 875 that referred to both a weapon that is inherently deadly and one used in a way that it is capable of causing and likely to cause death or great bodily injury. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *The Information*

The information charged Jackson with two counts of assault with a deadly weapon (Pen. Code,[1] § 245, subd. (a)(1); counts 1 and 4) and one count of robbery (§ 211; count 2).[2] The information alleged Jackson had been previously convicted of two serious or violent felonies within the meaning of the three strikes law (§§ 667, subds. (b)-(j), 1170.12) and of a serious felony under section 667, subdivision (a)(1).[3] The information also alleged Jackson had served a prior prison term within the meaning of former section 667.5, subdivision (b). Jackson pleaded not guilty to the charges and denied the special allegations.

---

[1] All further statutory references are to the Penal Code.

[2] The court dismissed a second robbery charge (count 3) at the preliminary hearing.

[3] The trial court bifurcated the prior conviction allegations from the trial on the other charges. Jackson waived his right to a jury trial on the prior conviction allegations and later admitted their truth.

B.    *The Evidence at Trial*

On December 9, 2017 Cleaves-Hall, Akaie Davis, Vai Taylor, and Taylor's cousin Sonay[4] drove from Cleaves-Hall's home in Downey to a nightclub in Culver City. Davis had one mixed alcoholic drink at the club; Taylor and Sonay drank alcohol at the club. Cleaves-Hall, who does not drink alcohol, was the group's designated driver.[5]

After listening to music and dancing for "at least a couple of hours," the group prepared to leave the club around 1:30 a.m. or 2:00 a.m. Taylor asked Cleaves-Hall if she would drive Taylor's friend Jackson to Cleaves-Hall's home so that Taylor, who had parked her car near Cleaves-Hall's house, could drive Jackson home from there. Cleaves-Hall was reluctant to drive Jackson because she did not know him, and because he and Davis "had words" in the club. "But things [had] calmed down," and Cleaves-Hall acquiesced.

Cleaves-Hall drove the group towards her home in Downey. Jackson sat in the rear passenger-side seat. The drive took approximately 20 to 22 minutes. During the drive, Jackson called the women "bitches" and other "negative names." Davis testified Jackson appeared intoxicated and smelled like alcohol in the car; Cleaves-Hall did not "smell liquor" on Jackson, but it appeared to her "that [Jackson] may have been on something." Jackson was "mouthy the whole time, being rude and disrespectful."

---

[4]    Sonay's last name is not in the record.

[5]    Downey Police Officer Adan Avila testified Davis told him "everyone" was drinking alcohol at the club. Davis denied making that statement.

3

Cleaves-Hall received a telephone call or text message while driving, which seemed to agitate Jackson. Jackson "then directed all his comments and anger" at Cleaves-Hall, who pulled over on the freeway and argued with Jackson. Taylor asked Cleaves-Hall to "hurry up" and get home so that Taylor could transfer Jackson to her car and drive him home. Cleaves-Hall resumed driving.

When they arrived, Cleaves-Hall parked a few houses away from her house. Sonay left the car to retrieve some belongings from inside Cleaves-Hall's home while the others waited in the car. Jackson "was still arguing and fussing." Davis testified, "[I]t was a lot of swearing and he continued to call us bitches."

Jackson got out of the rear passenger-side seat and moved to sit on the floor in front of the front passenger seat, near Cleaves-Hall's purse. Jackson attempted to make "small conversation" with Cleaves-Hall, who was texting a friend on her telephone and did not respond to Jackson. Cleaves-Hall told Jackson she did not want to talk to him. Jackson "snatched" Cleaves-Hall's telephone from her hand. Cleaves-Hall told Jackson, "please don't snatch anything from me," and Jackson "tossed [the telephone] back over at" her.

Jackson got out of the car, walked to a neighboring house, and "picked up [a] wooden object out of [the neighbor's] yard." Davis testified Jackson "went over and . . . yanked the object out of the ground." Cleaves-Hall thought the item was a wooden holiday decoration: "It was the object that they basically have around Christmas time. You stick it in the ground. And [Jackson] pulled it out of the ground." The object "kind of looked like . . . a two[-by-]four. It's like one of those decorations basically."

Jackson "picked up the object and . . . started darting towards" Cleaves-Hall, who was still in the car, "as if he was going to hit [her] with it." Jackson's "right arm was raised as if it was in

4

. . . a striking motion." As Jackson approached the car, Cleaves-Hall "felt uneasy and uncomfortable" because she "felt that [Jackson] was going to hit [her] with" the lawn ornament, so she got out of the car, as did Davis.

Jackson told Cleaves-Hall, "I'm going to fuck you up. I'm going to beat your ass." Davis heard Jackson say "he was going to bust [Cleaves-Hall's] head wide open." Jackson attempted to take Cleaves-Hall's telephone again, and they "tussled a little"; during the struggle, Jackson put his hands around Cleaves-Hall's neck, and Cleaves-Hall fell to the ground. Cleaves-Hall's left front and back shoulder were scratched when she fell to the ground. Her neck was not injured from Jackson grasping it.

Cleaves-Hall's "blood was boiling," and she "got right back up." Davis and Taylor tried to push Jackson away. Jackson hit Cleaves-Hall on the left side of her head with the lawn ornament. Cleaves-Hall was crying and saying, "Sister, my head, my head." Davis saw blood on Cleaves-Hall's head.

As Jackson moved away "down the street a tad bit," he threw the lawn ornament at Cleaves-Hall from about 10 feet away, hitting her in the same spot on her head. The lawn ornament fell to the ground and broke into two pieces.

After Jackson threw the lawn ornament at Cleaves-Hall, he walked to her car and "grabbed" her purse out of the car. As Jackson walked down the street, Cleaves-Hall "told him to give [her] back [her] purse, give [her] back [her] purse." Cleaves-Hall called 911, and Davis followed Jackson "asking him to give [the] purse back."[6] Cleaves-Hall and Davis both saw Jackson stop and

---

[6] Cleaves-Hall testified she was convicted of felony welfare fraud in 2016, and she told the 911 operator she was "not supposed

throw Cleaves-Hall's purse.  Cleaves-Hall did not run after Jackson and take her purse back because she "had already got hit twice," and she was afraid of him.  She thought Jackson would try to hit her again.

As Davis followed Jackson, Jackson stepped behind a "huge dumpster" at an apartment complex and emerged with a "huge object."  Davis described the object as a foot-and-a-half-long to two-foot-long stick.  Jackson approached Davis with the stick raised above his head; Davis backed away, stopping against a parked car.  Jackson swung the stick at Davis, who "grabbed the stick with [her] two hands.  [Jackson was] holding it at the bottom and [Davis] grabbed it at the top."  The stick was hard; Davis could not recall whether it was wooden, metal, or porcelain.  Jackson and Davis grappled over the stick for "about a minute"; Jackson "eventually got the stick" and threw it at Davis.  Davis dodged out of the way, and the stick hit the car behind her.  "By this time, [Davis] heard sirens," and Jackson "turned and ran."

After Cleaves-Hall called 911, Downey Police Officers David Gallo and Adan Avila arrived "very quickly."  Officer Gallo testified Cleaves-Hall had a head injury, and was angry and crying; Officer Avila testified Cleaves-Hall was "in pain," crying, and "a bit hysterical."  Cleaves-Hall told Officer Gallo that Jackson had thrown "a Christmas statue" at her and had placed his hands around her neck.  Officer Avila recovered "a one-foot small porcelain Christmas decoration" from under a parked car.  The police never located a stick or found any object matching the description of the stick Davis described.

---

to have police contact."  Cleaves-Hall told the 911 operator she "was scared to have any type of getting in trouble."

Medical personnel examined Cleaves-Hall.  They asked to take her to the hospital, but she declined because she had to work the next day.  Davis refused medical treatment.

Police apprehended Jackson.  Cleaves-Hall identified him as the person who had attacked her and stolen her purse.  Davis separately identified Jackson as the person who had assaulted Cleaves-Hall and her.

When Jackson took Cleaves-Hall's purse, the purse contained her wallet, makeup, perfume, and cash.  "Some money [was] missing" when fire department personnel, who had retrieved the purse from a nearby roof, returned it to her.  Cleaves-Hall did not know how much money was missing from her purse.  When the police took Jackson into custody, he had $122.15 in cash, a cellular telephone, a charger, and keys.

Cleaves-Hall went to work the next day.  She felt "sore, and . . . had a headache for a while . . . [a] couple days."

C.     *The Amended Information*

After the People rested, Jackson moved for acquittal on all charges pursuant to section 1118.1.  The court granted Jackson's motion as to the robbery charge (count 2), finding the evidence insufficient to sustain a conviction on that count.  The People amended the information to add one count of petty theft (§ 484; count 5) and to add the phrase "stick or stick-like object" to count 4 (assault of Davis with a deadly weapon) to conform the information to the proof at trial.  Jackson pleaded not guilty to the charges in the amended information and denied the special allegations.

D.     *The Jury Verdicts and the Sentencing*

The jury found Jackson guilty of assault of Cleaves-Hall with a deadly weapon (count 1) and of petty theft (count 5).  The

jury acquitted Jackson of assault of Davis with a deadly weapon (count 4), but found him guilty of the lesser included offense of simple assault (§ 240).

The trial court struck one of Jackson's two prior serious or violent felony convictions and struck the prior prison term allegation. The court sentenced Jackson to an aggregate state prison term of 13 years. The court imposed the upper term of four years on count 1 (assault of Cleaves-Hall with a deadly weapon), doubled to eight years under the three strikes law, plus a five-year term for the prior serious felony conviction under section 667, subdivision (a)(1). The court sentenced Jackson to 180 days in county jail on each of the misdemeanor counts (counts 4 and 5) to be served concurrently with the prison term on count 1.

Jackson timely appealed.

## DISCUSSION

A.     *Relevant Proceedings*

The trial court instructed the jury on the elements of assault with a deadly weapon with former CALCRIM No. 875. The court stated: "The defendant is charged in counts 1 and 4 with assault with a deadly weapon other than a firearm. [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] The defendant did an act with a deadly weapon other than a firearm that by its nature will directly and probably result in the application of force to a person . . . . [¶] The term deadly weapon other than a firearm is an[y] object, instrument, or weapon that is inherently deadly or one that is used in such a way that it is capable of causing and likely to cause death or great bodily injury." The court also instructed the jury with CALCRIM No. 915, the standard instruction on the lesser included offense of simple assault.

The prosecutor argued in closing argument that Jackson used the lawn ornament as a deadly weapon:

"The law defines a deadly weapon. In our everyday meaning of life, sometimes we think a deadly weapon is a knife, a gun, a chainsaw. Those things are deadly weapons. Brass knuckles, those are deadly weapons. There's no argument there. But under the law, that's not the only way an instrument is considered a deadly weapon. If it is capable of causing and likely to cause great bodily injury, then under the law it's considered a deadly weapon. This pen, if I take it and I bash in someone's eye, it's capable of causing great bodily injury. But it's a pen. Under the law, any object that is capable of causing great bodily injury, if it is used in that manner, is a deadly weapon. It doesn't have to be a knife. It doesn't have to be a gun. You know that the defendant was intending to use those objects as deadly weapons because of his words and the manner that he used those objects.

"You know that the deadly weapon in the first incident on [Cleaves-Hall] was the porcelain statue, which you have a piece of that was recovered from the police officers at the scene. It's heavy. It's porcelain, it's sharp when it breaks. Clearly, this is something that if I throw it at your head, it's going to likely cause serious bodily injury. There's a great chance of that, or a laceration. It's going to do some damage to you. Or you take this and you poke it into

9

someone's body, it's going to cause great bodily injury."

Defense counsel argued the People did not prove Jackson used the lawn ornament as a deadly weapon:

"[I]f we believe everything that the prosecutor said . . . you still have to come back with not guilty on assault with a deadly weapon. Why? They have the burden of proof. The deadly weapon. . . . Where is the statue? This two-foot large object? . . . They have the burden of proof to bring this item to show you that it was a deadly weapon, and as it was used it was a deadly weapon as used.

"A gun, of course, is a deadly weapon. We are not talking about that, right? . . . Is that item, as used, a deadly weapon? And there's no evidence before you . . . no evidence of poking. . . . There's no evidence of poking with this object . . . .

"So was the item likely to produce great bodily injury? . . . Was that action likely to produce great bodily injury?"

At this point, the trial court interjected, "It's not the action. It's the object." Defense counsel continued, "The object, as used, likely to produce great bodily injury? And here, it did not." Defense counsel further argued:

"My argument is that the People did not prove this case beyond a reasonable doubt. [CALCRIM No.] 875, assault with a deadly weapon. Object likely to produce death or great bodily injury. Deadly weapon, there's a definition in there. What is the object? I'm

10

not quite sure what the object is.  But you see the photos there, too, underneath the car. . . .  And in the manner it was used, was it likely to produce death?  Of course not.  Is it likely to produce great, like, bodily injury?  We don't have that here."

B.  *The Trial Court Did Not Prejudicially Err by Instructing the Jury with CALCRIM No. 875*

The parties agree a holiday lawn ornament is not an inherently deadly weapon.  (Cf. *Aledamat*, *supra*, 8 Cal.5th at p. 8 ["Courts have held that a knife is not inherently deadly *as a matter of law*.  Only a few items that are designed to be used as deadly weapons are inherently deadly."].)  The parties thus also agree the trial court erred by instructing the jury the lawn ornament could be an inherently deadly weapon.  The parties disagree about whether the instructional error requires reversal of Jackson's conviction of assault of Cleaves-Hall with the lawn ornament.  We conclude the instructional error was harmless beyond a reasonable doubt.

1.  Aledamat *and alternative-theory error*

In *Aledamat*, *supra*, 8 Cal.5th 1 the jury convicted the defendant of assault with a deadly weapon pursuant to section 245, subdivision (a)(1), based on his use of a box cutter.  The Supreme Court held it was error to instruct the jury pursuant to CALCRIM No. 875 that a weapon could be either inherently deadly or deadly in the way it had been used when the weapon could not be inherently deadly as a matter of law.  Because the trial court did not define "'inherently deadly'" and thus "the jury would not be equipped to know that, contrary to what the instruction suggested, a box cutter is *not* an inherently deadly weapon" (*Aledamat*, at p. 8), the court evaluated the error in

11

permitting the jury potentially to convict the defendant under the legally erroneous theory a box cutter was inherently deadly under the "beyond a reasonable doubt" standard of review established in *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*) for federal constitutional error. (*Aledamat*, at p. 13; accord, *People v. Stringer* (2019) 41 Cal.App.5th 974, 984 ["we review alternative-theory errors under the *Chapman v. California* (1967) 386 U.S. 18 [ ] standard governing federal constitutional errors"].) Under the *Chapman* standard, we "must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, [we] determine[ ] the error was harmless beyond a reasonable doubt."[7] (*Aledamat*, at p. 13.)

> 2. *The alternative-theory error was harmless beyond a reasonable doubt*

The Supreme Court explained in *Aledamat* that because the instructions there did not define an inherently deadly weapon, the jurors "'could reasonably classify a box cutter, which is sharp and used for cutting, as inherently dangerous based on the common understanding of the term,'" and thus potentially convict the defendant of assault with a deadly weapon regardless of how he had used the box cutter. (*Aledamat, supra*, 8 Cal.5th at p. 8.) The holiday lawn ornament here does not cause a similar concern. No juror could reasonably classify a holiday lawn ornament "as inherently dangerous based on the common understanding of the

---

[7] The People argue the instructional error here was factual rather than legal and thus subject to review under the more lenient state standard of review set forth in *People v. Watson* (1956) 46 Cal.2d 818. We need not address that argument because we find the error was harmless beyond a reasonable doubt under the more stringent federal *Chapman* standard of review.

term."  As Cleaves-Hall described the lawn ornament, "[i]t's like one of those decorations basically."

Furthermore, the prosecutor did not argue the lawn ornament was an inherently deadly weapon.  (See *People v. Powell* (2021) 63 Cal.App.5th 689, 715 ["Courts look to the prosecutor's argument as a relevant circumstance in determining whether instructional error is harmless."].)  The prosecutor argued the opposite, explaining that even everyday objects such as pens can constitute deadly weapons if they are used in a manner capable of causing and likely to cause great bodily injury.  The prosecutor argued the lawn ornament was such an object:  "It's heavy.  It's porcelain, it's sharp when it breaks.  Cleary, this is something that if I throw it at your head, it's going to likely cause serious bodily injury.  There's a great chance of that . . . ."[8]  Defense counsel emphasized the People had the burden of proving the lawn ornament "as it was used . . . was a deadly weapon as used."  (See *Aledamat*, *supra*, 8 Cal.5th at p. 14 ["no one ever suggested to the

---

[8]    The prosecutor compared everyday objects used as deadly weapons to deadly weapons "[i]n our everyday meaning of life" such as knives, guns, chainsaws, and brass knuckles to explain that an everyday object can be "considered a deadly weapon" if it is used in a manner "capable of causing and likely to cause great bodily injury."  Jackson contends the prosecutor's characterization of knives as deadly weapons enhanced the likelihood the jury believed the lawn ornament was inherently deadly.  Even if the prosecutor erroneously implied knives are inherently deadly weapons as a matter of law, the prosecutor drew a clear distinction between knives and guns, on the one hand, and pens and lawn ornaments, on the other, explaining that the latter items may constitute deadly weapons if used in a manner "capable of causing and likely to cause great bodily injury."

13

jury that there were two separate ways it could decide whether the [object] was a deadly weapon"].)[9]

In addition, to convict Jackson of assault of Cleaves-Hall with the lawn ornament, the jury necessarily found that (1) Jackson did an act with a deadly weapon (either inherently or as used) that by its nature would directly and probably result in the application of force; (2) Jackson was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone; and (3) Jackson had the present ability to apply force with a deadly weapon to a person. As in *Aledamat*, no reasonable jury that made all of these findings could have failed to find that Jackson used the lawn ornament—swinging it at Cleaves-Hall's head and/or throwing it at her head—in a way that was capable of causing and likely to cause great bodily injury. (Cf. *Aledamat*, *supra*, 8 Cal.5th at p. 15 ["'[n]o reasonable jury that made all of these findings could have failed to find' that defendant used the

---

[9] Defense counsel also argued the jury must determine, "Was that action likely to produce great bodily injury?" The trial court interjected, "It's not the action. It's the object." Jackson argues the trial court's interjection improperly instructed the jury that Jackson's use of the object was irrelevant. To the contrary, the court's statement correctly reminded the jury that to convict Jackson of assault with a deadly weapon the jury must find Jackson used the object in a way capable of causing and likely to cause great bodily injury, rather than focusing on Jackson's conduct independent of the object. In response to the court's interjection, defense counsel clarified his argument: "[Was] [t]he object, as used, likely to produce great bodily injury? And here, it did not."

14

box cutter in a way that is capable of causing or likely to cause death or great bodily injury"].)

## DISPOSITION

The judgment is affirmed.


                                      McCORMICK, J.*


We concur:


        PERLUSS, P. J.


        FEUER, J.

---

*        Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.