Filed 12/27/21  P. v. Sandoval CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>v.<br><br>RANDOLPH SANDOVAL,<br><br>  Defendant and Appellant. | H047410<br>(Santa Clara County<br> Super. Ct. No. C1649948) |

A jury convicted defendant Randy Sandoval of second degree murder and attempting to dissuade a witness.  It was undisputed at trial that Sandoval was not the actual killer.  He was prosecuted for murder on theories of direct aiding and abetting, conspiracy to commit murder, and natural and probable consequences.  After Sandoval's trial, the Legislature enacted Senate Bill No. 1437 (2017-2018 Reg. Sess.; (Senate Bill 1437)), which amended Penal Code section 188 so as to eliminate natural and probable consequences liability for murder.[1]  In legislation that will take effect on January 1, 2022, the Legislature further amended the law to allow "[a] person convicted of murder . . . whose conviction is not final [to] challenge on direct appeal the validity of that conviction based on the changes made to [s]ections 188 and 189 by Senate Bill 1437."  (Stats. 2021, ch. 551, §2; Senate Bill No. 775 (Senate Bill 775).)  On appeal, Sandoval contends that—given the elimination of natural and probable consequences liability for murder—the trial court erred in instructing the jury on that theory of liability.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

He maintains that instructional error requires reversal of his conviction and remand for retrial. The Attorney General agrees, as do we. Accordingly, we shall reverse the murder conviction.

## I. BACKGROUND

### A. *Factual Summary*

Sandoval and his girlfriend, Margaret Z., lived in San Jose next door to Roman Alvarado. On October 7, 2016, Sandoval lent his car to his friend Jeffrey Cooper. Cooper was only supposed to be gone an hour, but he still had not returned the car three days later. Sandoval and Margaret contacted Cooper to convince him to return the car without success. Early on the evening of October 10, Alvarado happened to run into Cooper, who was with Sandoval's car. Alvarado drove the vehicle to Sandoval's house with Cooper in the passenger seat. Sandoval went outside when Alvarado and Cooper arrived in his car. According to Margaret, who was watching out the window of the home she shared with Sandoval, Sandoval was frustrated and punched or slapped Cooper in the face. Sandoval then took Cooper's belongings—including a suitcase and a storage bin—out of the car and threw them on the ground.

Cooper eventually left in a cab. Records from Yellow Checker Cab Company showed that, on October 10, 2016, a passenger by the name of Jeffrey was picked up by a cab at Sandoval's address at 6:54 p.m. and was dropped off on Ridder Park Drive at 7:19 p.m.

Margaret testified that, after the car was returned, Sandoval took a bag with several bottles of hard alcohol in it over to Alvarado's backyard shed. At about 8:00 p.m., Sandoval and Alvarado came inside and drank beer in Sandoval's kitchen. According to Margaret, both men were intoxicated. She further testified that they were "in this rage, all hyped up," and saying they were going to teach Cooper a lesson.

Margaret testified that the two men left the house at about 9:00 p.m. Alvarado told Margaret, "We're going to take care of him." They returned at about 10:00 p.m., at

2

which time Alvarado said to Margaret, "He's not gonna bother you no more. I stabbed him in the chest and I stabbed him in the arm."

Cooper was found dead in the parking lot of the Lowe's on Ridder Park Drive. He was on the ground beside his vehicle, which he was living in at the time.

The chief medical examiner for the Santa Clara County Medical Examiner Coroner's Office testified that she autopsied Cooper. She testified that Cooper had suffered a puncture wound to the upper right chest, which punctured the chest plate, traversed the entire aorta, and punctured the underlying airway. The chief medical examiner testified that it would have required "great force" to cause those injuries. The injury to the aorta "caused a tremendous amount of bleeding inside the pericardial sac," which surrounds the heart. She opined that so much blood accumulated in the pericardial sac that Cooper's heart could no longer pump, killing him. The injury to the airway also caused bleeding into the lungs.

Margaret submitted an online tip to police on October 13, 2016 identifying Alvarado as Cooper's killer. Police contacted Margaret by text message and interviewed her in person on October 28 and November 1, 2016.

Sandoval and Alvarado were arrested on November 2, 2016. Police interviewed Alvarado that evening. Alvarado told police he and Sandoval went to the Lowe's to confront Cooper, Alvarado opened the vehicle door to look in, Cooper jumped up, and Alvarado stabbed him.

Sandoval told police during an interview on December 27, 2016 that Alvarado killed Cooper. Sandoval remained in the car during the stabbing.

### B. Procedural History

The Santa Clara County District Attorney charged Sandoval and Alvarado with Cooper's murder (§ 187; count 1). The information alleged that Alvarado had personally used a deadly and dangerous weapon in the commission of the crime. (§ 12022,

3

subd. (b)(1)).  Sandoval also was charged with attempting to dissuade a witness (§ 136.1, subd. (b)(2); count 2).

The defendants were tried jointly to separate juries in May and June 2018.  The prosecutor argued that Sandoval, though not the actual killer, was criminally liable for Cooper's murder as a direct aider and abettor, as a member of a conspiracy to kill Copper, or under the natural and probable consequences doctrine.  With respect to the natural and probable consequences doctrine, the prosecutor's theory was that the murder was a natural and probable consequence of the crime of assault with a deadly weapon or the crime of assault by force likely to produce great bodily injury, which Sandoval either aided and abetted or conspired to commit.

On June 15, 2018, Sandoval's jury returned verdicts of not guilty of first degree murder but guilty of second degree murder and guilty of attempting to dissuade a witness.  Alvarado's jury likewise found him not guilty of first degree murder but guilty of second degree murder.  Alvarado's jury further found true the allegation that Alvarado had personally used a deadly and dangerous weapon in the commission of the crime.

In February 2019, in advance of his sentencing, Sandoval filed a section 1170.95 petition.  The prosecutor opposed the petition, which the trial court denied without issuing an order to show cause on August 30, 2019.  At the same hearing, the court imposed sentence.  The court sentenced Sandoval to a term of 15 years to life on count 1 and the midterm of two years on count 2, to be served concurrently.  Sandoval timely appealed.

## II.    DISCUSSION

The trial court instructed Sandoval's jury with CALCRIM No. 403 on a natural and probable consequences theory of murder liability.  While that was a valid theory at the time, the Legislature has since amended the Penal Code to eliminate natural and probable consequences liability for murder (Senate Bill 1437) and to permit defendants to rely on that change in the law to challenge their convictions on direct appeal (Senate

4

Bill 775). Sandoval and the Attorney General agree that, as a result of Senate Bills 1437 and 775, instruction on a natural and probable consequences theory of murder liability constituted prejudicial error.[2]

### A.     *Legal Principles*

Prior to the enactment of Senate Bill 1437, "an aider and abettor [was not required to] personally possess malice, express or implied, to be convicted of second degree murder under a natural and probable consequences theory." (*People v. Gentile* (2020) 10 Cal.5th 830, 847 (*Gentile*).) Indeed, " 'the mens rea of the aider and abettor with respect to [the nontarget] offense [was] irrelevant [because] culpability [was] imposed simply because a reasonable person could have foreseen the commission of the nontarget crime.' [Citation.]" (*People v. Chiu* (2014) 59 Cal.4th 155, 164, superseded by statute as stated in *People v. Lewis* (2021) 11 Cal.5th 952, 959, fn. 3.)

Effective January 1, 2019, Senate Bill 1437 amended section 188 to provide that, outside the context of felony murder, "in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (Stats. 2018, ch. 1015 § 2.) "The natural and probable consequences doctrine is incompatible with this requirement . . . ." (*Gentile*, *supra*, 10 Cal.5th at p. 847.) Accordingly, our Supreme Court has concluded that "Senate Bill 1437 eliminates natural and probable consequences liability for murder regardless of degree." (*Id.* at pp. 847-848.)

Senate Bill 1437 also enacted section 1170.95, subdivision (a), which permits a person convicted of murder under a natural and probable consequences theory to petition the sentencing court to have his or her murder conviction vacated and to be resentenced on any remaining counts. A person is entitled to section 1170.95 relief if, among other

---

[2] The parties advance these arguments in supplemental letter briefs filed after the enactment of Senate Bill 775. Initially, Sandoval raised other issues on appeal, which we need not reach because we find the instructional error issue to be dispositive.

things, he or she "could not be convicted of first or second degree murder" following the enactment of Senate Bill 1437. (§ 1170.95, subd. (a)(3).)

In *Gentile*, our Supreme Court held that "[t]he ameliorative provisions of Senate Bill 1437 do not apply on direct appeal to nonfinal convictions obtained before the law became effective. Such convictions may be challenged on Senate Bill 1437 grounds only through a petition filed in the sentencing court under section 1170.95." (*Gentile*, *supra*, 10 Cal.5th at pp. 851-852.)

In 2021, while this case was pending on appeal, the Legislature enacted Senate Bill 775. Among other things, Senate Bill 775 amends section 1170.95 to provide that "[a] person convicted of murder, attempted murder, or manslaughter whose conviction is not final may challenge on direct appeal the validity of that conviction based on the changes made to Sections 188 and 189 by Senate Bill 1437 (Chapter 1015 of the Statutes of 2018)." (Stats. 2021, ch. 551, §2.) Senate Bill 775 will take effect on January 1, 2022. (Cal. Const., art. IV, § 8, subd. (c)(1) [absent urgency clause, statutory amendments enacted during regular session of the Legislature become effective on January 1 of the following year].) Because there is no possibility that Sandoval's judgment will be final by that effective date, we address the impact of that legislation on his conviction. (*People v. Vieira* (2005) 35 Cal.4th 264, 306 [a "judgment is not final until the time for petitioning for a writ of certiorari in the United States Supreme Court has passed"]; *People v. Lizarraga* (2020) 56 Cal.App.5th 201, 206 ["a petition for writ of certiorari is timely filed within 90 days after entry of judgment of a state court of last resort"].)

### B.     Analysis

Here, the trial court instructed the jury on a theory of murder liability that remains valid—direct aiding and abetting. The trial court also instructed on a theory of murder liability that is invalid due to changes made to section 188 by Senate Bill 1437—natural and probable consequences. Thus, so-called alternative-theory error—where the jury is

6

instructed on a legally adequate theory of guilt and a legally inadequate one (e.g., one that is contrary to law)—occurred.  (*People v. Aledamat* (2019) 8 Cal.5th 1, 7-9 (*Aledamat*).  Senate Bill 775 allows Sandoval to raise this error on direct appeal.  We assess alternative-theory error under *Chapman v. California* (1967) 386 U.S. 18 and reverse unless we determine the error was harmless beyond a reasonable doubt.  (*Aledamat*, *supra*, at p. 13; *Gentile*, *supra*, 10 Cal.5th at p. 851-852.)

Applying the *Chapman* standard, we cannot conclude the error was harmless.  The prosecutor argued the now-invalid natural and probable consequences theory during closing argument, urging jurors to convict "without even finding that [Sandoval] was intending on having Jeffrey Cooper killed."  As the parties agree, reversal is required.

## III.    DISPOSITION

Sandoval's murder conviction is reversed.  We remand the matter to the trial court with instructions that the People may, if they choose, retry Sandoval on count 1 within the time limit prescribed by law.  If the People choose not to retry, the trial court is directed to resentence Sandoval on count 2.

                                           _____

                                           ELIA, J.

WE CONCUR:

_____

GREENWOOD, P.J.

_____

GROVER, J.

*People v. Sandoval*
H047410